**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

JULIAN SELPH,

     Petitioner,

v.                                                     Civ. No. 22-240 JCH/KK

GEORGE STEPHENSON, *et al.*,

     Respondents.

**MAGISTRATE JUDGE'S PROPOSED FINDINGS
AND RECOMMENDED DISPOSITION**

In August 2017, a state court jury convicted Petitioner Julian Selph of sexually abusing his daughter, M.S. (Doc. 12-3 at 7-12, 49-59; Doc. 12-4 at 1-10.) The state trial court sentenced Mr. Selph to 339 years of imprisonment for 21 criminal convictions related to the abuse. (Doc. 12-4 at 11-44.) After unsuccessful state court appellate and habeas proceedings, Mr. Selph filed this action under 28 U.S.C. § 2254, seeking reversal of his convictions. (Doc. 1.)

Now before the Court is Mr. Selph's amended Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (Doc. 6) ("Amended Petition"), filed November 9, 2022. On October 8, 2024, United States District Judge Judith C. Herrera referred this case to me to conduct hearings as warranted, and to perform any legal analysis required to recommend an ultimate disposition of the case. (Doc. 17.) Having carefully considered the parties' submissions, the record, and the relevant law, I recommend that the Court DENY Mr. Selph's Amended Petition and DISMISS this matter with prejudice.

## I.  BACKGROUND

### A.  Evidence Presented at Trial

The following evidence was presented at Mr. Selph's jury trial in the Eleventh Judicial District Court for the State of New Mexico on August 22 and August 23, 2017.

Julia Sherman, who is M.S.'s mother, testified that she and Mr. Selph were married but separated in 2006 and divorced in June 2008. (Tr. 1 at 72-73.[1]) Ms. Sherman reported that when the divorce was finalized, Mr. Selph had custody of M.S. and her brother, G.S., during the week, while Ms. Sherman had custody on weekends. (*Id.* at 76, 80.) However, Ms. Sherman indicated that, effective September 11, 2013, the custody arrangement was modified so that she had custody of the children during the week and Mr. Selph had custody on weekends. (*Id.* at 75-76, 79-80.) According to Ms. Sherman, Mr. Selph consistently exercised his weekend visitation rights, with the exception of one or two periods of less than a month. (*Id.* at 79.)

M.S. testified at length about the sexual abuse with which Mr. Selph was charged. She testified that Mr. Selph began to sexually abuse her when she was seven years old.[2] (*Id.* at 45.) Initially, the abuse involved Mr. Selph touching M.S.'s vagina underneath her clothes "[i]t felt like every night." (*Id.*) Around the time she was in fifth grade, Mr. Selph also began to touch her breasts. (*Id.* at 46, 55.) Then, while she was still in his custody during the week, Mr. Selph had her "give him a blow job," which she described as Mr. Selph "putting his penis in [her] mouth." (*Id.* at 45-47, 56.) Once the fellatio began, it occurred "about every day" she was in his custody. (*Id.* at 46-47.) Mr. Selph also had M.S. rub his testicles and "[a] couple times" had her "jack him off with [her] hand." (*Id.* at 133-34.)

The abuse initially occurred in Mr. Selph's bedroom, where he and M.S. had begun sharing a bed at night "right after [Ms. Sherman] left." (*Id.* at 47.) Later, after Mr. Selph's bedroom developed a leak, Mr. Selph slept with M.S. in "the kids' room," with M.S. and

---

[1] Citations to "Tr. 1" and "Tr. 2" refer to the two-volume transcription of the audio recording of Mr. Selph's August 2017 trial.

[2] Based on M.S.'s testimony regarding her birth date, she turned seven years old in September 2008. (Tr. 1 at 35.)

2

Mr. Selph sharing the "blue bed," while G.S. slept in various places including the blue bed or the adjacent "white bed." (*Id.* at 47, 126-27, 129-30.) At times Mr. Selph abused M.S. in G.S.'s presence while G.S. slept. (*Id.* at 48.) Mr. Selph almost always ejaculated into the crack between the two beds at the conclusion of the abuse. (*Id.* at 131-32, 134-35.) He often ejaculated in her mouth, ejaculated "in [her] butt" around five times, and had also ejaculated in her vagina. (*Id.* at 147-48.)

After Mr. Selph's and Ms. Sherman's custody arrangement changed so that Mr. Selph had custody of the children on the weekends, Mr. Selph caused M.S. to engage in fellatio at least once every weekend, and usually twice, on Friday and Saturday nights. (*Id.* at 49-50, 52, 62, 134.) M.S. did not recall staying apart from Mr. Selph during the times when he had custody of her, though she admitted it could have happened. (*Id.* at 53-54.) She did recall several occasions when she and Mr. Selph spent up to a week with family friends or relatives, but she could not recall when these visits occurred. (*Id.* at 64-69.) During these visits, Mr. Selph usually slept with her and sometimes sexually abused her. (*Id.* at 68-69.)

Sometime in 2013, the abuse stopped for close to a month after M.S. told Mr. Selph she "didn't want to do this anymore." (*Id.* at 61, 69.) Otherwise, the abuse continued until April 24, 2015, when M.S. jumped from Mr. Selph's truck while it was in motion.[3] (*Id.* at 33-39, 52.) At the time, Mr. Selph was driving M.S. and G.S. from Ms. Sherman's home to his home and had been discussing his desire to regain custody of the children during the week. (*Id.* at 33-39.) When M.S. "asked him about court," Mr. Selph became so angry she

---

[3] Based on M.S.'s testimony regarding her birth date, she was thirteen years old on April 24, 2015. (Tr. 1 at 35.)

3

thought he was going to kill her. (*Id.* at 34, 54.) Frightened, she stated that she wanted to

go home, and Mr. Selph replied that the only way she could go home was if she jumped

from the truck. (*Id.* at 38.) Mr. Selph's reply prompted M.S. to jump. (*Id.*)

Witness Valerie Krebbs testified that on April 24, 2015, she was driving on Highway 64

near Bloomfield, New Mexico, when she saw a girl who had just fallen from the vehicle in front

of her. (*Id.* at 24-26.) Ms. Krebbs estimated that at the time both she and the other vehicle were

traveling at about 55 to 60 miles per hour. (*Id.* at 25-26.) She reported that she pulled over and saw

M.S. "disoriented walking in the highway," with no shoes on and "covered from head to toe in

road rash." (*Id.*) Ms. Krebbs further stated that M.S.'s "clothes were ripped and torn and she was

screaming out of fear and pain." (*Id.*) According to M.S., after Ms. Krebbs stopped for her, an

ambulance came and took her to the hospital. (*Id.* at 40-42.) M.S. further reported that at the

hospital she was asked if she had been sexually assaulted and she responded in the affirmative.

(*Id.* at 42.)

On cross-examination, defense counsel elicited testimony from Ms. Sherman and M.S.

regarding adults to whom M.S. could have disclosed sexual abuse before April 24, 2015, including

Ms. Sherman, M.S.'s grandparents, and personnel at M.S.'s school. (*See id.* at 57-59, 63, 82-83.)

Defense counsel also elicited testimony from Ms. Sherman that M.S. never told Ms. Sherman she

did not want to see Mr. Selph, and that if M.S. had done so, Ms. Sherman would have

"encourage[d]" her to go to Mr. Selph's home but could not have forced her. (*Id.* at 82-83.)

According to M.S., a long time before April 2015, she had told a cousin about the abuse,

but she had not told anyone else because her father "somehow found out" she had told her cousin

and threatened to "beat" or "knock" her teeth out. (*Id.* at 42, 63, 68.) M.S. also testified that she

did not feel safe telling anyone because, more than once, Mr. Selph had threatened to kill her

family and hurt her. (*Id.* at 67.) M.S. further reported that "whenever [Mr. Selph] got drunk, he would start raging on about things [his children] didn't do," and "then he would start beating [them]." (*Id.* at 40.)

Detective Jon Nyce of the San Juan County Sheriff's Department testified that, about a week after April 24, 2015, he set up a safehouse interview of M.S. (Tr. 2 at 5-6.) Detective Nyce reported that, during the interview, M.S. disclosed where the abuse occurred, including the spot on the mattress where Mr. Selph usually ejaculated. (*Id.* at 7.) According to the detective, about a year later he and other officers executed a search warrant at Mr. Selph's residence, where he observed that M.S.'s description of where Mr. Selph had sexually abused her was accurate. (*Id.* at 7, 10.) Detective Nyce and other officers took photos of the area on the mattress where M.S. said Mr. Selph typically ejaculated. (Tr. 1 at 134-36; Tr. 2 at 7-8.) When M.S. identified the photos depicting this area at trial, she noted that it "look[ed] like cum" was present and explained that Mr. Selph's semen had accumulated over several years without being cleaned. (Tr. 1 at 135-36.)

Crime Scene Investigator Sandra Richardson testified that she collected a sample of the mattress in question for DNA testing, and Detective Nyce testified that he collected a sample of Mr. Selph's DNA for comparison. (Tr. 2 at 8, 11, 15.) Forensic scientist Ewelina Bajda testified that the mattress sample had "a significant amount of yellowish-brown deposit on one of the sides of the fabric that was partially saturated onto the other layers of the fabric." (*Id.* at 18, 26.) Based on testing she conducted, Ms. Bajda opined that the deposit on the mattress sample consisted of semen that matched Mr. Selph's DNA profile. (*Id.* at 26-36.)

Dr. Margie Trujillo, M.S.'s psychotherapist, testified as an expert in the diagnosis and treatment of childhood emotional behavioral disorders. (*See* Tr. 1 at 89-93.) Dr. Trujillo identified typical symptoms of children who have experienced abuse, including depression, anxiety,

emotional freezing, blunted speech and affect, dysfunction in relationships, academics, or employment, arrested emotional development, trust issues, suicidal ideation, and attempted suicide. (*Id.* at 94-98.) She also indicated that it is "common" for children not to disclose sexual abuse and that when they do disclose, it is "not uncommon" for the disclosure to occur in "driblets of information." (*Id.* at 99-102.)

Dr. Trujillo testified that she had been treating M.S. for nearly two years for recurrent, severe depressive disorder and post-traumatic stress disorder ("PTSD"). (*Id.* at 102-03.) Dr. Trujillo initially testified that M.S.'s PTSD was "related to sexual abuse," but on defense counsel's objection, the court instructed the jury to disregard this testimony. (*Id.*) Dr. Trujillo then testified that M.S. had been hospitalized for major depression and had been "very suicidal." (*Id.* at 104.) Defense counsel objected again and the court excused the jury. (*Id.*) The court then had the prosecution make a tender of Dr. Trujillo's remaining testimony and outlined what testimony it would and would not permit her to give. (*Id.* at 105-09.)

When the jury returned, Dr. Trujillo testified that M.S.'s behaviors were consistent with those of children who have experienced severe, intense sexual trauma over a long duration and that Dr. Trujillo was "treating her for this." (*Id.* at 109-10.) On cross examination, Dr. Trujillo acknowledged that experiences other than sexual trauma could cause a child to have the types of symptoms she had linked to abuse on direct examination. Dr. Trujillo agreed that these other experiences included the child witnessing the abuse of a loved one, living in poverty, or residing with a parent who has mental health issues, or the child's family splitting up. (*Id.* at 112-13.)

## B. Procedural History

On June 3, 2015, Mr. Selph was charged by criminal information in the Eleventh Judicial District Court for the State of New Mexico with one count of Criminal Sexual Penetration (Child

Under 13) ("CSP Under 13"), and one count of Criminal Sexual Penetration (Child Age 13-18) ("CSP Age 13-18"). (Doc. 12-1 at 6-7.) In or about January 2016, the prosecution offered Mr. Selph a plea agreement with respect to these two charges plus two charges in another criminal case pending against him. (Doc. 1-6; Doc. 12-5 at 35.) The prosecution told Mr. Selph that it would amend the criminal information to add more charges against him if he did not accept the plea offer. (Doc. 12-4 at 131, 163.) Nevertheless, Mr. Selph rejected the plea offer. (Doc. 6 at 8; Doc. 12-4 at 81.) On May 26, 2016, the prosecution filed an amended information charging Mr. Selph with thirty-six counts of CSP Under 13, eighteen counts of CSP Age 13-18, and one count of Bribery of a Witness. (Doc. 12-1 at 8-18.)

The state amended the criminal information against Mr. Selph three more times between July 22, 2016 and July 11, 2017, with the Fourth Amended Criminal Information charging:  (1) one count of Criminal Sexual Contact of a Minor (Child Under 13) ("CSC Under 13"); (2) twelve counts of CSP Under 13; (3) seven counts of CSP Age 13-18; and, (4) one count of Bribery of a Witness. (*Id.* at 19-30; Doc. 12-2 at 7-17.) In addition, on April 24, 2017, June 12, 2017, and July 7, 2017, the prosecution filed statements of fact describing the evidence on which the charges against Mr. Selph were based. (Doc. 12-1 at 41-46, 51-52; Doc. 12-2 at 1-6.)

The case against Mr. Selph was initially tried to a jury on July 25, 2017. (Doc. 12-5 at 264.) However, the trial court granted defense counsel's motion for a mistrial after the prosecution's first witness, Ms. Sherman, testified on direct examination that her custody arrangement with Mr. Selph had changed in April 2015 because Mr. Selph was incarcerated. (Doc. 13, Audio Rec. of July 25, 2017 Tr. at 11:57:56-12:05:00.) After the mistrial, defense counsel filed a motion to bar retrial, which the court denied. (Doc. 12-2 at 39-43; Doc. 12-3 at 5-6.)

The prosecution then amended the criminal information against Mr. Selph twice more, on August 11, 2017 and August 21, 2017. (Doc. 12-2 at 33-38; Doc. 12-3 at 7-12.) The Sixth Amended Criminal Information ("Sixth Information") ultimately charged Mr. Selph with:

- one count of CSC Under 13, which was alleged to have occurred between June 1, 2008 and December 31, 2010;

- twelve counts of CSP Under 13, with each count alleged to have occurred during a unique time period beginning with the period from January 1, 2011 to August 31, 2013, and ending with the period from August 1 to August 30, 2014[4];

- seven counts of Criminal Sexual Contact of a Minor (Person in Position of Authority) ("CSC PPA"), with each count alleged to have occurred during a unique time period beginning with the period from September 1 to September 30, 2014, and ending with the period from April 1 to April 25, 2015[5]; and,

- one count of Bribery of a Witness, which was alleged to have occurred between May 1, 2011 and March 31, 2012.

(Doc. 12-3 at 7-12.)

The case against Mr. Selph was tried to a jury again on August 22 and August 23, 2017. (Doc. 12-5 at 265.) After the prosecution rested, defense counsel moved for a directed verdict on

---

[4] Specifically, the charging periods for the twelve counts of CSP Under 13 in the Sixth Information were: (1) January 1, 2011 to August 31, 2013; (2) September 1 to September 30, 2013; (3) October 1 to October 31, 2013; (4) November 1 to November 30, 2013; (5) December 1 to December 31, 2013; (6) January 1 to February 28, 2014; (7) March 1 to March 31, 2014; (8) April 1 to April 30, 2014; (9) May 1 to May 31, 2014; (10) June 1 to June 30, 2014; (11) July 1 to July 31, 2014; and, (12) August 1 to August 30, 2014. (Doc. 12-3 at 8-9.)

[5] Specifically, the charging periods for the seven counts of CSC PPA in the Sixth Information were: (1) September 1 to September 30, 2014; (2) October 1 to October 31, 2014; (3) November 1 to December 31, 2014; (4) January 1 to January 31, 2015; (5) February 1 to February 28, 2015; (6) March 1 to March 31, 2015; and, (7) April 1 to April 25, 2015. (Doc. 12-3 at 10-11.)

all counts. (Tr. 2 at 43-45.) Defense counsel also renewed a pretrial motion for the court to consider the charged sexual abuse as three courses of conduct rather than 20 individual acts. (*Id.* at 45-48.) The trial court denied the motions and found that the prosecution had presented sufficient evidence for all of the charges to go to the jury. (*Id.* at 51-52.)

Defense counsel did not call Mr. Selph to testify, and in response to the trial judge's questioning, Mr. Selph confirmed that he agreed with that decision. (*Id.* at 56-57, 62.) The defense rested without presenting a case-in-chief. (*Id.* at 62.)

The jury found Mr. Selph guilty of all of the charges in the Sixth Information. (Doc. 12-3 at 49–59; Doc. 12-4 at 1-10.) On September 19, 2017, the trial court sentenced Mr. Selph to 339 years' imprisonment for these convictions.[6] (Doc. 12-4 at 28-44.)

Mr. Selph appealed his convictions on January 17, 2018, and the New Mexico Court of Appeals affirmed the convictions on February 4, 2020. (Doc. 12-4 at 55, 230-49.) Mr. Selph petitioned the New Mexico Supreme Court for a writ of certiorari, which the court denied on March 19, 2020. (*Id.* at 250-64.)

Acting *pro se*, Mr. Selph filed a petition for a writ of habeas corpus in state district court on June 16, 2021. (Doc. 12-4 at 266-91; Doc. 12-5 at 4-5, 24, 33-50.[7]) On June 21, 2021, the state district court dismissed Mr. Selph's petition, finding that it "plainly appear[ed] from the face of the petition that the Petitioner [was] not entitled to relief as a matter of law." (Doc. 12-5 at 51-53.) Mr. Selph again petitioned the New Mexico Supreme Court for a writ of certiorari, which the court

---

[6] The trial court also sentenced Mr. Selph to three years' imprisonment for his convictions in another criminal case. (Doc. 12-4 at 32, 40-43.) The Amended Petition does not challenge these convictions. (*See generally* Doc. 6.)

[7] In the record attached to Respondents' answer, the pages of Mr. Selph's state habeas petition are out of order and interspersed with copies of other documents. (*See* Doc. 12-4 at 266-97; Doc. 12-5 at 1-50.) This misarrangement appears to be a clerical error, and Mr. Selph has not challenged it in any pleading before this Court.

denied on February 15, 2022. (*Id.* at 54-96, 227.) Mr. Selph also filed a motion for rehearing *en banc*, which was denied on March 25, 2022. (*Id.* at 228-57.)

Still acting *pro se*, Mr. Selph filed this action under 28 U.S.C. § 2254 on March 30, 2022. (Doc. 1.) On October 11, 2022, the Court directed Mr. Selph to file an amended petition to cure defects in the original petition, which he did on November 9, 2022. (Docs. 5, 6.) In the Amended Petition, Mr. Selph challenges his convictions on the following grounds:

Claim One:  The trial court erroneously admitted testimony by Dr. Trujillo that improperly bolstered M.S.'s testimony;

Claim Two:  (a) Insufficient evidence supported his convictions; (b) the Sixth Information violated his right to due process; and, (c) the Sixth Information violated his right against double jeopardy;

Claim Three:  The prosecution vindictively added charges against him after he rejected a plea offer;

Claim Four:  His trial counsel provided him with constitutionally ineffective assistance;

Claim Five:  The cumulative effect of all errors rendered his trial fundamentally unfair;

Claim Six:  The trial court's refusal to bar retrial after it declared a mistrial violated his right against double jeopardy; and,

Claim Seven:  The trial court improperly coached the prosecution on how to examine Dr. Trujillo.

(Doc. 6 at 5-11, 16-20.) Respondents answered Mr. Selph's Amended Petition on February 27, 2023, and Mr. Selph filed a reply in support of it on March 8, 2023. (Docs. 12, 15.)

## II. EXHAUSTION

Under 28 U.S.C. § 2254, a federal district court generally may not consider the merits of a habeas petition unless the petitioner has exhausted the remedies available to him in state court. 28 U.S.C. § 2254(b)(1)(A). To exhaust his state-court remedies, the petitioner must properly present each ground on which he challenges his conviction "to the highest state court, either by direct review of the conviction or in a postconviction attack." *Brown v. Shanks*, 185 F.3d 1122, 1124 (10th Cir. 1999); *Dever v. Kan. State Penitentiary*, 36 F.3d 1531, 1534 (10th Cir. 1994). In other words, "[t]o exhaust a claim, a state prisoner must pursue it through one complete round of the State's established appellate review process, giving the state courts a full and fair opportunity to correct alleged constitutional errors." *Selsor v. Workman*, 644 F.3d 984, 1026 (10th Cir. 2011) (quotation marks omitted). "[T]he substance of a habeas petitioner's federal claims must be fairly presented to the state courts before they can be raised in federal court, and petitioner bears the burden of demonstrating that he has exhausted his available state remedies." *McCormick v. Kline*, 572 F.3d 841, 851 (10th Cir. 2009) (quotation marks omitted).

As the United States Supreme Court has observed, however, petitioners "often fail to raise their federal claims in compliance with state procedures, or even raise those claims in state court at all." *Shinn v. Ramirez*, 596 U.S. 366, 378 (2022). If a procedural rule would cause a state court to deny a claim that the petitioner either failed to present or presented improperly at an earlier stage, the claim is "technically exhausted because, in the habeas context, state-court remedies are 'exhausted' when they are no longer available, regardless of the reason for their unavailability." *Id.* (quotation marks and ellipsis omitted). "But to allow a state prisoner simply to ignore state procedure on the way to federal court would defeat the evident goal of the exhaustion rule," *i.e.*,

to "promote federal-state comity." *Id.* This conundrum gives rise to "an important corollary to the exhaustion requirement: the doctrine of procedural default." *Id.* (quotation marks omitted).

"The doctrine of procedural default prevents a federal court from reviewing the merits of a claim—including constitutional claims—that a state court declined to hear because the prisoner failed to abide by a state procedural rule." *Williams v. Trammell*, 782 F.3d 1184, 1212 (10th Cir. 2015) (quotation marks omitted). The related doctrine of anticipatory procedural default, in turn, prevents a federal court from reviewing the merits of "an unexhausted claim that would be procedurally barred under state law if the petitioner returned to state court to exhaust it." *Fontenot v. Crow*, 4 F.4th 982, 1019 (10th Cir. 2021); *Moore v. Schoeman*, 288 F.3d 1231, 1233 n.3 (10th Cir. 2002).

For procedural default or anticipatory procedural default to bar a claim, the state procedural rule at issue must be "adequate and independent." *Fontenot*, 4 F.4th at 1028. A rule "'is independent if it relies on state law, rather than federal law,' and is 'adequate if it is firmly established and regularly followed.'" *Id.* (quoting *Smith v. Workman*, 550 F.3d 1258, 1274 (10th Cir. 2008)). Federal courts will generally decline to hear a procedurally defaulted claim unless the petitioner can show (1) cause for the default and actual prejudice resulting from the alleged violation of federal law, or (2) that failure to consider the claim will result in a fundamental miscarriage of justice. *Shinn*, 596 U.S. at 379; *Smith v. Allbaugh*, 921 F.3d 1261, 1267 (10th Cir. 2019); *Byrd v. Workman*, 645 F.3d 1159, 1167 (10th Cir. 2011).

Procedural default is an affirmative defense. *Tryon v. Quick*, 81 F.4th 1110, 1139 (10th Cir. 2023). Thus, if the state does not raise it, it is waived. *Hooks v. Ward*, 184 F.3d 1206, 1216

(10th Cir. 1999); *Mitchell v. Sharp*, 798 F. App'x 183, 192 n.8 (10th Cir. 2019).[8] "[T]he state bears the burden of proving the adequacy of a state procedural bar in order to preclude federal habeas review." *Hooks*, 184 F.3d at 1217.

> This is not to say, however, that a petitioner has no responsibility to put the adequacy of the state procedural bar at issue before the state is required to come forward with its proof. Once the state pleads the affirmative defense of an independent and adequate state procedural bar, the burden to place that defense in issue shifts to the petitioner.

*Id.* The petitioner places the defense at issue by, at a minimum, making "specific allegations … as to the inadequacy of the state procedure." *Id.*

With the exception of one claim discussed below, Respondents "do not dispute that Mr. Selph appears to have properly exhausted available state-court remedies." (Doc. 12 at 13 n.5.) Thus, and because Respondents address the merits of Mr. Selph's other claims in their answer, they have waived any exhaustion defense to those claims. *See McCormick v. Parker*, 571 F. App'x 683, 687-88 (10th Cir. 2014) (holding that state waived exhaustion defense where it conceded that petitioner had exhausted his state court remedies and addressed merits of his arguments in its response).

Respondents do not, however, concede that Mr. Selph properly exhausted his state court remedies with respect to his claim that the Sixth Information violated his right against double jeopardy. In his Amended Petition, Mr. Selph asserts that this "claim was fully exhausted on direct appeal." (Doc. 6 at 8.) But Respondents contend that this claim is unexhausted and procedurally defaulted because Petitioner did not raise it in his certiorari petition on direct appeal or on state

---

[8] In the Tenth Circuit, unpublished decisions are not binding precedent but may be cited for their persuasive value. *United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005).

habeas review, and a state court procedural rule would likely bar it if he returned to state court to exhaust it. (Doc. 12 at 15-16.)

The record reveals the following procedural history pertinent to this claim. First, Mr. Selph did argue that the Sixth Information violated his right against double jeopardy before the New Mexico Court of Appeals on direct appeal. (Doc. 12-4 at 127-31.) But he did not raise this claim in his direct-appeal certiorari petition. (*See id.* at 250-61.)

Second, Mr. Selph did not raise this claim in the habeas petition he filed in state district court.[9] (*See id.* at 266-91; Doc. 12-5 at 4-5, 24, 33-50.) Nor did he raise it in his state habeas certiorari petition or his request for rehearing *en banc*. (Doc. 12-5 at 54-96, 228-55.) In other words, neither on direct appeal nor in state habeas proceedings did Mr. Selph properly present the substance of this claim to the state's highest court, as he was required to do to exhaust his state court remedies. *Brown*, 185 F.3d at 1124; *Dever*, 36 F.3d at 1534.

As noted above, once the state has raised the defense of an independent and adequate state procedural bar, the burden to place the defense in issue shifts to the petitioner, who must, at a minimum, make specific allegations as to the inadequacy of the state procedure. *Hooks*, 184 F.3d at 1217. Here, Respondents have raised the defense of an independent and adequate state procedural bar to Mr. Selph's claim that the Sixth Information violated his right against double jeopardy. (Doc. 12 at 13-16.) Thus, the burden shifted to Mr. Selph to place the defense in issue. However, Mr. Selph has made no attempt to allege that the state procedural rule on which

---

[9] In his state habeas petition, in answer to the question, "[h]ave the grounds being raised in this petition been raised previously in your direct appeal," Mr. Selph wrote that he sought "to clarify his contentions that due process and double jeopardy protections were violated at trial." (Doc. 12-4 at 267, 291.) However, the only substantive double jeopardy argument raised in the state habeas petition concerned his claim that the trial court should have barred retrial after mistrial. (*Id.* at 271-75.)

14

Respondents rely is inadequate. (*See generally* Docs. 6, 15.) Nor has he made any attempt to allege that the Court should nevertheless refrain from deeming his double jeopardy claim procedurally defaulted because (a) there is cause for the default and actual prejudice resulting from the alleged violation of federal law, or (b) failure to consider the claim will result in a fundamental miscarriage of justice. (*Id.*) I therefore recommend that the Court apply the doctrine of anticipatory procedural default to bar the portion of Claim Two alleging that the Sixth Information violated Mr. Selph's right against double jeopardy.[10]

## III. STANDARD OF REVIEW

Under 28 U.S.C. § 2254, a federal court may grant a state prisoner's petition for a writ of habeas corpus only if the prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Moreover, under Section 2254(d), when the prisoner's claims have been adjudicated on the merits in state court, a petition can only be granted if the state court's decision: (1) was contrary to, or unreasonably applied, "clearly established Federal law, as determined by the Supreme Court of the United States"; or, (2) "was based on an unreasonable

---

[10] Moreover, Mr. Selph's claim that the Sixth Information violated his right against double jeopardy is substantively without merit because the New Mexico Court of Appeals acted reasonably in rejecting it. On direct appeal, Mr. Selph argued that eleven of the CSP Under 13 counts, and all of the CSC PPA counts, in the Sixth Information violated his right against double jeopardy because these charges covered a single indistinguishable course of conduct rather than multiple distinct criminal acts. (Doc. 12-4 at 128-31.) In so arguing, Mr. Selph appeared to raise a double jeopardy claim based on "multiplicity," which "refers to multiple counts of an indictment which cover the same criminal behavior." *United States v. Fleming*, 19 F.3d 1325, 1330 (10th Cir. 1994). "[M]ultiplicity is not fatal to an indictment" but "poses the threat of multiple sentences for the same offense," which raises double jeopardy concerns. *United States v. Morehead*, 959 F.2d 1489, 1505 (10th Cir. 1992) (citations omitted), *aff'd en banc on other grounds sub nom. United States v. Hill*, 971 F.2d 1461 (10th Cir. 1992); *see generally Albernaz v. United States*, 450 U.S. 333, 343 (1981) ("[T]he Double Jeopardy Clause … protects against multiple punishments for the same offense."). Here, however, the Sixth Information does not suffer from multiplicity because it differentiates each charged sex offense by the unique time period during which it allegedly occurred. Moreover, at trial, the prosecution presented evidence that the sex offense charged in each count occurred at least once during the time period specified in that count. Thus, the Sixth Information does not include multiple counts that cover the same criminal behavior, and Mr. Selph faced no risk of multiple sentences for the same offense.

determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court decision is contrary to clearly established federal law "if the state court applies a rule different from the governing law set forth in [United States Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state court decision unreasonably applies clearly established federal law if it "correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of the particular case." *Id.* "Where … the state court's application of governing federal law is challenged, it must be shown to be not only erroneous, but [also] objectively unreasonable." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003); *see also Woods v. Donald*, 575 U.S. 312, 316 (2015) ("[A]n unreasonable application of [Supreme Court] holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice.") (quotation marks omitted). "Evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Welch v. Workman*, 639 F.3d 980, 1010 (10th Cir. 2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)) (brackets omitted).

Federal habeas review of a state court's determination that a prisoner's claim lacks merit is "highly deferential." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *Woodford v. Visciotti,* 537 U.S. 19, 24 (2002). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Rather, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded

jurists could disagree on the correctness of the state court's decision." *Id.* at 101 (quotation marks omitted).

> If this standard is difficult to meet, that is because it was meant to be…. [Section] 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.

*Id.* at 102-03 (citation and quotation marks omitted).

Review under Section 2254(d) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 563 U.S. at 181, 185; *Black v. Workman*, 682 F.3d 880, 895 (10th Cir. 2012). Federal courts must "presume the factual findings of the state court are correct unless the petitioner rebuts that presumption by clear and convincing evidence." *Welch*, 639 F.3d at 991 (quoting 28 U.S.C. § 2254(e)(1)) (quotation marks omitted). A petitioner is entitled to an evidentiary hearing when "his allegations, if true and if not contravened by the existing factual record, would entitle him to habeas relief." *Anderson v. Attorney Gen. of Kan.*, 425 F.3d 853, 858 (10th Cir. 2005). However, the petitioner's factual allegations must be "specific and particularized, not general or conclusory." *Id.* at 858-59. "Moreover, an evidentiary hearing is unnecessary if the claim can be resolved on the record." *Id.* at 859.

> [B]ecause the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate. In practical effect ... this means that when the state-court record precludes habeas relief under the limitations of § 2254(d), a district court is not required to hold an evidentiary hearing.

*Cullen*, 563 U.S. at 183 (citation and quotation marks omitted).

For a state court decision to survive federal habeas review, the state court need not have cited to United States Supreme Court cases, or even been aware of them, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). Indeed, "determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning" at all. *Harrington*, 562 U.S. at 98. Unless the state court indicated that it did *not* consider an issue on the merits, even a summary denial will be deemed "on the merits" for purposes of Section 2254 review. *Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004); *see Cullen*, 563 U.S. at 187 ("Section 2254(d) applies even where there has been a summary denial."); *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999) ("[W]e owe deference to the state court's *result*, even if its reasoning is not expressly stated.") (emphasis in original). Where the highest state court denies discretionary review from a lower court's dismissal of a habeas petition but does so without providing reasons, federal courts "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and apply a rebuttable presumption "that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018).

## IV. ANALYSIS

I address the claims in Mr. Selph's Amended Petition in the order in which he presents them, except for Claim Five, which alleges cumulative error and should therefore be considered last.

### A.  Claim One (Challenging Admission of Dr. Trujillo's Testimony)

In Claim One, Mr. Selph argues that the trial court erroneously allowed Dr. Trujillo to bolster M.S.'s testimony by testifying that M.S.'s psychological disorders and treatment resulted

from sexual abuse. (Doc. 6 at 5.) Mr. Selph raised this claim on direct appeal and state habeas review. (Doc. 12-4 at 120-27; Doc. 12-5 at 41-49.) Mr. Selph's analysis of the claim in prior proceedings relied entirely on state evidentiary law, except for one isolated, unsupported assertion in his state habeas petition that the trial court's state-law evidentiary errors violated his "right to a fundamentally fair trial guaranteed by the Constitutions of the United States and New Mexico." (Doc. 12-5 at 48.) Consequently, in rejecting Mr. Selph's challenges to Dr. Trujillo's testimony, the state courts focused their analysis on the state-law evidentiary issues Mr. Selph raised. (*See* Doc. 12-4 at 232-38; Doc. 12-5 at 51-53.) Nevertheless, the New Mexico Court of Appeals' thorough analysis of the evidentiary issues also encompassed the impact of the evidence on the fairness of Mr. Selph's trial, and the state district court relied on the appellate court's analysis on state habeas review.[11] (*Id.*) Thus, the state courts did address the merits of Claim One as Mr. Selph raised it in prior proceedings.

Initially, whether the state trial court wrongly applied New Mexico evidentiary law in admitting Dr. Trujillo's testimony is outside the scope of this Court's review. "[S]itting as a federal habeas court applying 28 U.S.C. § 2254, it is not for [this Court] to review a state court's evidentiary rulings. Rather, a federal habeas court reviews only for violation of the Constitution, laws, or treaties of the United States." *Romano v. Gibson*, 239 F.3d 1156, 1166 (10th Cir. 2001) (citation and quotation marks omitted).[12] Moreover, Mr. Selph has not cited—and I am not aware of—any Supreme Court case holding that a state court's erroneous application of state law

---

[11] The New Mexico Supreme Court denied Mr. Selph's state-habeas certiorari petition without explanation. (Doc. 12-4 at 263-64.) Thus, this Court "look[s] through" that denial to the state district court's decision dismissing Mr. Selph's state habeas petition. *Wilson*, 584 U.S. at 125.

[12] An exception to this rule, inapplicable here, is when a state court applies the state's evidentiary rules unfairly to prevent a defendant from presenting critical exculpatory evidence. *Romano*, 239 F.3d at 1166.

regarding the admission of bolstering testimony violates a criminal defendant's clearly established federal rights. (*See* Doc. 12-4 at 120-27; Doc. 12-5 at 41-49; *see also* Docs. 6, 15.) Accordingly, even if the trial court did misapply New Mexico law in admitting Dr. Trujillo's testimony, as Mr. Selph claims, the mere fact of such an error is not a basis for federal habeas relief.

Further, to the extent Mr. Selph claims that the trial court's admission of Dr. Trujillo's testimony rendered his trial fundamentally unfair, (*see* Doc. 12-5 at 48), this claim also fails. The Tenth Circuit's decision in *Parker v. Scott*, 394 F.3d 1302 (10th Cir. 2005) is instructive on this issue. In *Parker*, the petitioner challenged the state trial court's admission of expert testimony that: (a) the alleged victim provided the expert with information that "was consistent with a child who had been sexually abused"; and, (b) in the expert's opinion, "sexual abuse took place" and the child "was a victim of sexual abuse." *Id.* at 1311. The *Parker* court concluded that the admission of this testimony was "not so egregious that it fatally infected or necessarily prevented a fair trial." *Id.* at 1311-12 (quotation marks and brackets omitted). In so holding, the court considered the expert's challenged testimony "in the context of her testimony as a whole" and noted that the expert did *not* opine that the petitioner had committed sexual abuse. *Id.* at 1312.

The expert testimony to which Mr. Selph objects here is, at worst, no more egregious than the testimony that survived federal habeas review in *Parker*. Dr. Trujillo did testify that she was treating M.S. for mental health disorders "related to sexual abuse." (Tr. 1 at 102.) But the trial court instructed the jury to disregard that testimony, (*id.*); and, the jury is presumed to have followed the court's instruction because Mr. Selph has failed to show an "overwhelming probability" that it was unable to do so and "a strong likelihood that the effect of the evidence would be devastating" to him. *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (quotation marks omitted). Also, even if the jury were assumed to have disregarded the trial court's instruction, the

excluded testimony was, at worst, no more egregious than the *Parker* expert's testimony that the alleged victim in that case was a victim of sexual abuse.

Also no more egregious than the *Parker* expert's analogous testimony was Dr. Trujillo's testimony that M.S.'s symptoms were consistent with those of children who have experienced severe, intense sexual trauma over a long duration and that Dr. Trujillo was "treating her for this." (Tr. 1 at 109-10.) "Viewed in context," this testimony, like the *Parker* expert's testimony, "indicated that the information she gained through [interaction with] the child was consistent with a person who suffered sexual abuse." *Parker*, 394 F.3d at 1312. And notably, like the *Parker* expert, Dr. Trujillo never opined that Mr. Selph committed sexual abuse. *Id.*

Further, "[i]nquiry into fundamental fairness requires examination of the entire proceedings, including the strength of the evidence against the petitioner." *Id.* at 1311. And here, the prosecution presented compelling evidence that Mr. Selph committed the crimes with which he was charged, including M.S.'s testimony that Mr. Selph routinely sexually abused her for years, until she jumped from a moving vehicle to get away from him, as well as physical and forensic evidence that corroborated her description of the abuse. Given all of these circumstances, the state courts did not contravene or unreasonably apply clearly established federal law or base their decisions on an unreasonable determination of the facts in rejecting Mr. Selph's claim that Dr. Trujillo's testimony improperly bolstered M.S.'s testimony. I therefore recommend that the Court DENY Claim One in Mr. Selph's Amended Petition.

## B.  Claim Two (Challenging Sufficiency of Evidence; Challenging Sixth Information on Due Process Grounds)

In Claim Two, Mr. Selph argues that his convictions should be reversed because the prosecution presented insufficient evidence at trial to support them, and because the Sixth

Information violated his right to due process.[13] (Doc. 6 at 7.) I address these two distinct legal challenges separately.

     1.  <u>The prosecution presented sufficient evidence to support Mr. Selph's convictions.</u>

In Claim Two, Mr. Selph first asserts that the prosecution presented insufficient evidence at trial to support his convictions. (Doc. 6 at 7.) Mr. Selph raised this claim on direct appeal, arguing that there was insufficient evidence to support all but three of the counts charged in the Sixth Information because M.S. "did not testify as to any occurrences on any specific dates, and did not discern amongst counts by relating holidays, major events, etc.," other than changes in her parents' custody arrangements.[14] (Doc. 12-4 at 128.) The New Mexico Court of Appeals rejected this argument, explaining that, viewed in the light most favorable to the prosecution, M.S.'s testimony that Mr. Selph sexually abused her almost every weekend during the relevant period, along with corroborating physical and forensic evidence, provided sufficient evidence to support the challenged convictions.[15] (Doc. 12-4 at 244-46.)

Under federal law, "evidence is sufficient to support a conviction whenever, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Parker v. Matthews*, 567

---

[13] Also in Claim Two, Mr. Selph argues that the Sixth Information violated his right against double jeopardy. (Doc. 6 at 7.) However, as discussed in Section II., *supra*, the doctrine of anticipatory procedural default bars this legal challenge.

[14] Mr. Selph did not dispute that there was sufficient evidence to support the single CSC Under 13 count, which was alleged to have occurred between June 1, 2008 and December 31, 2010, and the first CSP Under 13 count, which was alleged to have occurred between January 1, 2011, and August 31, 2013. (Doc. 12-4 at 128; *see* Doc. 12-3 at 7-8.) He also did not dispute that there was sufficient evidence to support the Bribery of a Witness charge. (Doc. 12-4 at 128; *see* Doc. 12-3 at 11.)

[15] On direct appeal, the New Mexico Supreme Court denied Mr. Selph's certiorari petition without explanation. (Doc. 12-4 at 263-64.) Thus, the Court "look[s] through" that denial to the New Mexico Court of Appeals' decision. *Wilson*, 584 U.S. at 125.

U.S. 37, 43 (2012) (emphasis in original) (quotation marks omitted). Further, on federal habeas review, a "state-court decision rejecting a sufficiency challenge may not be overturned … unless the decision was objectively unreasonable." *Id.* (quotation marks omitted). Under "this twice-deferential standard," *id.*, the question Mr. Selph's insufficient evidence claim presents is whether the New Mexico Court of Appeals reasonably decided that any rational juror could have found the essential elements of all of the crimes charged beyond a reasonable doubt. *Young v. Sirmons*, 486 F.3d 655, 666 (10th Cir. 2007).

A review of the evidence presented at Mr. Selph's trial confirms that the New Mexico Court of Appeals acted reasonably in concluding that a rational juror could have found all of the essential elements of all of the contested charges. For the eleven contested CSP Under 13 counts, the prosecution was required to prove that Mr. Selph caused M.S., while she was under 13 years old, to engage in fellatio at least once on, about, or between (1) the start and end of each calendar month from September 2013 through December 2013, (2) January 1, 2014, and February 28, 2014, and (3) the start and end of each calendar month from March 2014 through August 2014.[16] (Doc. 12-3 at 8-9, 18-28.) For the seven contested CSC PPA counts, in turn, the prosecution was required to prove that Mr. Selph used his position of authority over M.S. to coerce her, while she was at least 13 but less than 18 years old, to touch his genitals at least once on, about, or between (1) the start and end of each calendar month from September through October 2014, (2) November 1 and December 31, 2014, (3) the start and end of each calendar month from January through March

---

[16] In his Amended Petition, Mr. Selph does not challenge the sufficiency of the evidence regarding M.S.'s age during the time periods charged in these counts. (*See generally* Doc. 6.) In this regard, I note that based on M.S.'s testimony regarding her birth date, she turned thirteen at the beginning of September 2014. (Tr. 1 at 35.)

2015, and (4) April 1 and April 25, 2015.[17] (Doc. 12-3 at 10-11, 30-36.) Since M.S. testified that Mr. Selph caused her to engage in fellatio at least once every weekend from the September 11, 2013 modification of her parents' custody arrangement through the weekend before she jumped out of Mr. Selph's truck on April 24, 2015, as well as about every weekday for a period of time before the custody modification, the state appellate court reasonably concluded that there was sufficient evidence for a rational jury to convict Mr. Selph of each of these counts.

M.S. did testify that there was a period of about a month in 2013 when the abuse stopped after she told Mr. Selph she "didn't want to do this anymore." (Tr. 1 at 61-62, 69.) However, this testimony does not undermine the sufficiency of the evidence supporting any of the challenged convictions. The Sixth Information alleged that four of the contested charges occurred in 2013. Specifically, the information charged Mr. Selph with causing M.S. to engage in fellatio at least once on, about, or between the first and last days of September, October, November, and December 2013. (*See* Doc. 12-3 at 8.) Viewing M.S.'s testimony in the light most favorable to the prosecution, the period of time during which the abuse stopped was only "close to a month," not a "full month."[18] (Tr. 1 at 69.) Thus, this testimony does not absolve Mr. Selph of abusing M.S. for any full month in 2013, much less the full month of September, October, November, or December of that year.

M.S. also testified that there were a number of occasions when she and Mr. Selph spent up to a week with family friends or relatives, and that Mr. Selph only "[s]ometimes" sexually abused

---

[17] In his Amended Petition, Mr. Selph does not challenge the sufficiency of the evidence regarding his use of a position of authority to coerce M.S. (*See generally* Doc. 6.)

[18] Asked if there was a period of time when the sexual abuse stopped, M.S. responded, "[t]he week I told him not – or the month, sorry. The month I told him that I didn't want to do this anymore." (Tr. 1 at 69.) The prosecutor then asked, "[w]as it a full month, or was it a week, or do you remember," to which M.S. responded, "I don't know—I don't think it was a full month, but I think it was close to a month." (*Id.*)

her during these visits. (Tr. 1 at 53, 64-66, 68-69.) However, M.S. further testified that the only period of time when "the sex" did not "continue" was the period of close to a month when she told Mr. Selph that she "didn't want to do this anymore." (*Id.* at 61-62, 68-69.) Viewed in the light most favorable to the prosecution and noting that each charging period in the Sixth Information was at least 25 days long, (*see* Doc. 12-3 at 7-12), this testimony would allow a rational juror to find that Mr. Selph continued to sexually abuse M.S. at least once during each charging period. For all of these reasons, the state courts acted reasonably and in accordance with clearly established federal law in rejecting Mr. Selph's insufficient evidence claim and I recommend that the Court DENY his claim for relief on this ground.

2.   The Sixth Information gave Mr. Selph fair notice of the charges against him.

In his second legal challenge in Claim Two, Mr. Selph argues that the Sixth Information violated his right to due process. Mr. Selph raised this issue on direct appeal. (Doc. 12-4 at 127-31.) In support, he argued that the eleven contested CSP Under 13 counts and seven contested CSC PPA counts in the Sixth Information did not give him fair notice of the charges against him because the charges were indistinguishable, and the prosecution's evidence of ongoing abuse did not adequately distinguish between each such charge at trial.[19] (*Id.*) The New Mexico Court of Appeals rejected this argument, holding that the challenged counts provided Mr. Selph with fair notice because they were sufficiently differentiated by date and sufficiently narrow to allow him to prepare a defense. (Doc. 12-4 at 238-42.) The court further found that, contrary to Mr. Selph's

---

[19] In his Amended Petition, Mr. Selph elaborates on this argument by noting that the prosecutor, and not M.S., provided the date ranges charged in the Sixth Information. (Doc. 6 at 7.) However, he does not cite to, and I am not aware of, any clearly established federal law prohibiting a prosecutor from selecting specific date ranges derived from the more general testimony of an alleged child sex abuse victim regarding when the alleged abuse occurred. (*See generally* Docs. 6, 15.)

contentions, M.S. "testified with sufficient particularity as to the escalating nature of the sexual abuse." (*Id.* at 242.)

A charging document satisfies due process if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend." *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007); *Hamling v. United States*, 418 U.S. 87, 117 (1974). Courts evaluate "practical rather than technical considerations" to determine a charging document's sufficiency. *United States v. Dashney*, 117 F.3d 1197, 1205 (10th Cir.1997); *see generally Russell v. United States*, 369 U.S. 749, 763 (1962) ("Convictions are no longer reversed because of minor and technical deficiencies [in a charging document] which did not prejudice the accused."). Thus, the Tenth Circuit has held that a defendant's receipt of actual notice of the factual allegations against him prior to trial, or even at trial, can cure the failure of a charging document to provide fair notice of the charges against him. *See Ervin v. Santistevan*, 2022 WL 17665669, at *2-*3 (10th Cir. Dec. 14, 2022) (rejecting habeas challenge to indictment where evidence introduced at trial allowed defendant to prepare defense for multiple undifferentiated child pornography manufacturing charges); *Parks v. Hargett*, 188 F.3d 519, at *3 (10th Cir. 1999) (unpublished) (holding that even if information was deficient, evidence produced at preliminary hearing provided defendant with sufficient notice to respond to charges and prepare an adequate defense where it identified victim of alleged molestation and places where molestation occurred).

In light of these standards, it is plain that the state courts acted reasonably in finding that Mr. Selph received fair notice of the charges against him. The Sixth Information contained one count of CSC Under 13, twelve counts of CSP Under 13, seven counts of CSC PPA, and one count of Bribery of a Witness. (Doc. 12-3 at 7-11.) Each of the CSC and CSP counts alleged that Mr.

Selph committed a defined criminal act during a unique time period, *i.e.*, a time period that did not overlap with the time period alleged in any other count. (*Id.*)

In addition, over the course of pretrial proceedings, the prosecution filed three statements of fact, which collectively described in some detail the evidence on which the sex abuse charges were based. Among other things, the statements identified the alleged victim,[20] the sexual acts in which Mr. Selph allegedly caused her to engage, and when each type of sexual act allegedly occurred by days of the week, months, and years. (Doc. 12-1 at 41-46, 51-52; Doc. 12-2 at 1-6.) The statements also described the sources of this information, most particularly M.S.'s disclosures and Ms. Sherman's reports of when she and Mr. Selph separated, their initial custody arrangement, and when and how the arrangement changed. (*Id.*) Additionally, the statements of fact clarified that the prosecution was exercising its discretion not to charge Mr. Selph with all of the sexual offenses he allegedly committed during each unique time period, but instead to charge that he engaged in the type of sexual offense alleged in each count at least once during each time period. (*Id.*) Given these circumstances, a fair-minded jurist could certainly conclude that Mr. Selph had fair notice of the particular allegations against which he needed to defend and that due process was satisfied. For all of the above reasons, the state courts acted reasonably and in accordance with clearly established federal law in rejecting Mr. Selph's due process challenge to the Sixth Information and I recommend that the Court DENY his claim for relief on this ground.

---

[20] The CSC and bribery counts in the Sixth Information identified the alleged victim, while the CSP counts did not. (Doc. 12-3 at 7-12.) The prosecution's statements of fact, however, rectified the failure to identify the alleged victim in the CSP charges. (Doc. 12-1 at 41-46, 51-52; Doc. 12-2 at 1-6.)

## C.  Claim Three (Alleging Vindictive Prosecution)

Mr. Selph next contends that the prosecution violated his federal due process rights by vindictively adding new criminal charges against him after he rejected a plea offer. (Doc. 6 at 8.) In support of this claim, which Mr. Selph raised on direct appeal and state habeas review, Mr. Selph pointed to: (a) the prosecutor's statement at a pretrial hearing that Mr. Selph was told the criminal information against him would be amended if he did not accept a plea offer; and, (b) the fact that the prosecutor did amend the information to add many new charges against him after he rejected the offer.[21] (Doc. 12-4 at 131-34; Doc. 12-5 at 34-41.) According to Mr. Selph, these circumstances show that the prosecution impermissibly increased the charges against him to punish him for exercising his right to go to trial. (*Id.*) The New Mexico Court of Appeals rejected this argument, holding that the prosecutor's conduct did not demonstrate actual or likely vindictiveness. (Doc. 12-4 at 247-49.) On state habeas review, the district court relied on the appellate court's prior ruling. (Doc. 12-5 at 52.)

In *Bordenkircher v. Hayes*, 434 U.S. 357 (1978), the Supreme Court considered a habeas petitioner's vindictive prosecution claim based on allegations that, during plea negotiations, the

---

[21] In his state habeas petition, Mr. Selph indicated that he did not know the prosecution would add 53 new charges against him if he rejected the plea offer and was thus not "fully informed" of the offer's advantages and disadvantages. (Doc. 12-5 at 36-38; *see also* Doc. 6 at 8.) In support, Mr. Selph pointed out that the proposed plea agreement identified no additional charges that, "if not yet filed, shall not be brought against the defendant." (*Id.*; *see* Doc. 1-6 at 4.) Nevertheless, the record conclusively shows that Mr. Selph knew the prosecution intended to add charges against him if he rejected the plea offer. Indeed, on direct appeal, he based his entire vindictiveness argument on the prosecution's threat to do so. (Doc. 12-4 at 131-134, 177, 260.) For example, in his brief-in-chief before the New Mexico Court of Appeals, Mr. Selph relied on the prosecutor's statement that "[h]e was supposed to plead to those two [charges], told that that if he didn't [the information] would be amended, it was amended." (*Id.* at 131).) Further, in its answer to Mr. Selph's brief-in-chief, the state elaborated that Mr. Selph's "vindictive prosecution claim arises from a 'bind-over offer' from the prosecution, which required that he plead to the charges in the original [information] (one count each of CSP and CSC) or the State would file the rest of the charges," (*id.* at 163); and, Mr. Selph did not dispute this statement in his reply brief. (*See* Doc. 12-4 at 177.) Moreover, Mr. Selph has not raised a separate claim of prosecutorial misconduct based on the prosecution's alleged failure to specify how many charges it intended to add if he rejected its plea offer. As such, I consider Mr. Selph's allegations regarding this failure to be made solely to support his claim that the prosecution acted vindictively in adding the new charges.

prosecutor told the petitioner that the prosecutor would seek to increase the charges against him if he did not plead guilty to the original indictment. *Id.* at 358-59. The petitioner chose not to plead guilty, and the prosecutor did increase the charges against him. *Id.* at 359. Rejecting the petitioner's vindictive prosecution claim, the *Bordenkircher* Court explained that

> [w]hile confronting a defendant with the risk of more severe punishment clearly may have a discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices is an inevitable—and permissible—attribute of any legitimate system which tolerates and encourages the negotiation of pleas. It follows that, by tolerating and encouraging the negotiation of pleas, this Court has necessarily accepted as constitutionally legitimate the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to forgo his right to plead not guilty.

*Id.* at 364 (quotation marks, brackets, and citation omitted). Thus, the Court concluded that the prosecutor in that case did not violate due process by "openly present[ing] the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution." *Id.* at 365. In other words, the Court "upheld the prosecutorial practice of threatening a defendant with increased charges if he does not plead guilty, and following through on that threat if the defendant insists on his right to stand trial." *Alabama v. Smith*, 490 U.S. 794, 802 (1989).

Here, *Bordenkircher* shows that the state courts acted reasonably in rejecting Mr. Selph's vindictive prosecution claim. The record reflects that the prosecutor threatened to charge Mr. Selph with additional offenses if he did not accept a plea offer, and when Mr. Selph rejected the plea offer, the prosecution filed additional charges on which Mr. Selph was plainly subject to prosecution. *Bordenkircher* clearly holds that such conduct does not violate due process. 434 U.S. at 365.

Moreover, Mr. Selph identifies no other evidence that would render the state courts' finding of no actual vindictiveness unreasonable. *Cf. Wasman v. United States*, 468 U.S. 559, 568 (1984)

(noting that *Bordenkircher* "held that due process is not implicated when a prosecutor threatens to seek conviction on a greater offense if the defendant does not plead guilty and in fact does so when the defendant proceeds to trial" but "did not rule out … the possibility that a defendant could establish a due process violation by proof of actual vindictiveness"). The only other allegation Mr. Selph makes in support of his vindictive prosecution claim is that the prosecution did not specify how many new charges it intended to add if he rejected the plea offer. (Doc. 12-5 at 36-38; *see also* Doc. 6 at 8.)  But a fair-minded jurist could conclude that this omission does not show actual vindictiveness for the simple reason that Mr. Selph was plainly subject to prosecution for all of the new charges and more. *Bordenkircher*, 434 U.S. at 365.Thus, the state courts acted reasonably and in accordance with clearly established federal law in rejecting Mr. Selph's vindictive prosecution claim and Claim Three in Mr. Selph's Amended Petition should be DENIED.

### D.  Claim Four (Alleging Ineffective Assistance of Counsel)

In Claim Four, Mr. Selph argues that his trial counsel provided him with ineffective assistance in violation of the Sixth Amendment. (Doc. 6 at 10.) Mr. Selph raised this issue on state habeas review, claiming that his counsel was constitutionally ineffective because she failed to: (1) investigate M.S.'s school counseling history; (2) interview friends and relatives; (3) move for a mistrial following Dr. Trujillo's testimony; (4) retain an expert witness to counter Dr. Trujillo's testimony; (5) impeach M.S. with prior inconsistent statements; and, (6) offer testimony and records of Children Youth & Families Department ("CYFD") employees. (Doc. 12-4 at 276-87; Doc. 12-5 at 49-50.) The state district court rejected these arguments on the basis that Mr. Selph "[did] not state any factual support" for his ineffective assistance claim and "failed to make a prima facie showing" that his trial counsel was ineffective. (Doc. 12-5 at 52.)

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984). For a defendant to succeed on a claim of ineffective assistance of counsel, he must demonstrate both that "counsel's representation fell below an objective standard of reasonableness" and that "the deficient performance prejudiced the defense." *Id.* at 687-88. Courts "may address the performance and prejudice components in any order, but need not address both if [the petitioner] fails to make a sufficient showing of one." *Cooks v. Ward*, 165 F.3d 1283, 1292-93 (10th Cir. 1998).

In evaluating the first *Strickland* prong, a court's review of counsel's performance must be "highly deferential," *Byrd*, 645 F.3d at 1168, and a petitioner must overcome the "strong presumption" that his counsel "made all significant decisions in the exercise of reasonable professional judgment" and that "counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689-90. Reviewing courts must make "every effort ... to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. A court is required not only to give counsel "the benefit of the doubt," but also "to affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as they did." *Cullen*, 563 U.S. at 196 (citation and quotation marks omitted). "It is 'rare' that constitutionally competent representation will require 'any one technique or approach.'" *Id.* at 195 (quoting *Harrington*, 562 U.S. at 106) (brackets omitted).

As for the second *Strickland* prong, *i.e.*, prejudice, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. Rather, to obtain relief, a

defendant must show not only that his counsel's performance was objectively unreasonable, but also "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The *Strickland* "prejudice prong may not be satisfied through speculation." *Moore v. McKune*, 534 F. App'x 712, 724 (10th Cir. 2013).

When asserting a claim of ineffective assistance that a state court has rejected on the merits, the petitioner's burden is even heavier. "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (quotation marks and citations omitted); *see also Cullen*, 563 U.S. at 190 (noting that federal review of state court decision rejecting ineffective assistance claim is "doubly deferential" because federal court "take[s] a highly deferential look at counsel's performance through the deferential lens of § 2254(d)") (quotation marks and citations omitted). In addition, "*Strickland* created a general standard, thus giving a state court even more latitude to reasonably determine that a defendant has not satisfied that standard." *Welch*, 639 F.3d at 1010 (quotation marks and ellipsis omitted). Accordingly, federal courts "must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)" and avoid asking merely whether "counsel's actions were reasonable." *Harrington*, 562 U.S. at 105. Instead, the proper question is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

1. Failure to Investigate M.S.'s School Counseling History

Mr. Selph first claims that his trial counsel provided him with constitutionally ineffective assistance by failing to interview Darlene Martinez, M.S.'s school counselor, or to otherwise investigate M.S.'s school counseling history. (Doc. 6 at 10; *see* Doc. 12-4 at 276, 278.)

32

With respect to the first *Strickland* prong, a fair-minded jurist could find counsel's failure to investigate M.S.'s school counseling history to be objectively reasonable. In support of his contrary position, Mr. Selph first argues that the "chronology" of M.S.'s "lengthy and particularized history of counseling … would have provided valuable insight into the mental health and stability of the alleged victim." (Doc. 12-4 at 278.)  But a fair-minded jurist could conclude that it was objectively reasonable for counsel not to pursue this line of investigation, because evidence that M.S. suffered from psychological problems during her school years would have been unremarkable at best, and harmful to Mr. Selph at worst, in light of M.S.'s testimony that Mr. Selph routinely sexually abused her from age seven to thirteen and Dr. Trujillo's testimony that children experiencing such abuse suffer a range of serious psychological symptoms. *See Harrington*, 562 U.S. at 108 ("An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense.").

Mr. Selph also contends that evidence of M.S.'s school counseling history "would have demonstrated numerous opportunities [for M.S.] to disclose [Mr. Selph's] abuse to someone of authority whom [M.S.] knew well and had confided in previously." (Doc. 12-4 at 278.) However, a fair-minded jurist could conclude that defense counsel made the objectively reasonable choice to present equivalent evidence by other means. Specifically, defense counsel elicited M.S.'s admission, on cross-examination, that there was "a counselor" at school "[t]hat [she] could talk to," but she did not disclose being sexually abused by Mr. Selph to this person. (Tr. at 57-58.) Defense counsel further elicited testimony from M.S. and Ms. Sherman that M.S. failed to disclose the abuse to other people she knew well, most particularly her mother and grandparents. A fair-minded jurist could therefore conclude that Mr. Selph's trial counsel exercised reasonable

professional judgment and that her conduct fell within the wide range of reasonable professional assistance notwithstanding her failure to investigate M.S.'s school counseling history.

Turning to the second *Strickland* prong, a fair-minded jurist could also find no reasonable probability that the result of Mr. Selph's trial would have been different if his trial counsel had investigated M.S.'s school counseling history. Mr. Selph's assertion that this investigation would have provided "valuable insight" into M.S.'s mental health is vague and speculative and thus insufficient to establish prejudice. (Doc. 12-4 at 278); *Moore*, 534 F. App'x at 724. And again, the prosecution likely could have used any evidence such an investigation produced to Mr. Selph's detriment, by taking the position that any longstanding psychological problems would actually corroborate M.S.'s reports of longstanding sexual abuse. Further, as noted above, defense counsel actually elicited an admission from M.S. that she failed to disclose sexual abuse to her school's counselor, so additional evidence on that point would have been superfluous. For all of these reasons, the state courts acted reasonably and in accordance with clearly established federal law in rejecting Mr. Selph's claim that his counsel was constitutionally ineffective in failing to investigate M.S.'s school counseling history.

2.  Failure to Interview Friends and Relatives

Mr. Selph next claims that his trial counsel provided him with constitutionally ineffective assistance by failing to interview certain relatives and family friends. (Doc. 6 at 10; *See* Doc. 12-4 at 276-77.) In his state habeas petition, Mr. Selph elaborated that he "repeatedly urged trial counsel to interview": (a) family friends Bill and Bobbie Martin, with whom M.S. "spent the night from time to time"; (b) "cousin-in-law" Christina Meador, with whom M.S. "spent the night on several occasions"; (c) "Daniell [sic] Trujillo," a family friend and M.S.'s boyfriend's mother, in whose home M.S. "spent nights"; (d) Mr. Selph's cousin Brook Smith, with whom M.S. and Mr.

34

Selph "spent a lot of time"; (e) Mr. Selph's girlfriend Margaret Montoya, with whom M.S. and

Mr. Selph "often stayed"; and, (f) M.S.'s cousin Jesslyn Selph, who Mr. Selph suggests would

have contradicted M.S.'s testimony that M.S. disclosed the sexual abuse at issue to her. (*Id.*; *see*

Tr. 1 at 42.)

Regarding the first *Strickland* prong, a fair-minded jurist could conclude that trial counsel's

decision not to interview the first six individuals fell within the wide range of reasonable

professional assistance. Mr. Selph does not allege that M.S. stayed with any of these individuals:

(1) overnight; (2) during one or more periods charged in the Sixth Information; (3) on nights when

Mr. Selph had custody of M.S.; (4) without Mr. Selph also being present; ***and***, (5) with sufficient

frequency to undermine the prosecution's allegations that Mr. Selph sexually abused M.S. at least

once during the unique charging period for each sexual offense. On the contrary, if anything, Mr.

Selph's allegations tend to suggest otherwise.[22] Thus, Mr. Selph has failed to plausibly allege that

interviewing these individuals was likely to produce information that would materially assist in

his defense. Mr. Selph has also failed to plausibly allege that his counsel acted unreasonably by

foregoing this line of investigation in favor of simply getting M.S. to admit that she and Mr. Selph

spent nights away from home, where sexual abuse only "[s]ometimes" occurred. (Tr. 1 at 64-66,

68-69); *see generally Harrington*, 562 U.S. at 107 ("An attorney can avoid activities that appear

distractive from more important duties. Counsel was entitled to formulate a strategy that was

reasonable at the time and to balance limited resources in accord with effective trial tactics and

strategies.") (quotation marks and citation omitted).

---

[22] For example, Mr. Selph alleges that M.S. spent the night with the Martins "from time to time," with Ms. Meador "on several occasions," and with Ms. Trujillo a wholly unspecified number of times, and was with Mr. Selph when she spent time with Ms. Smith and stayed overnight with Ms. Montoya. (Doc. 12-4 at 276-77.)

Turning to the second *Strickland* prong, a fair-minded jurist could also conclude that Mr. Selph has failed to show prejudice from counsel's failure to interview these individuals. Absent more specific details, Mr. Selph's vague allegations that M.S. occasionally stayed with them fail to show a reasonable probability that the result of his trial would have been different had his counsel interviewed them. Rather, again, Mr. Selph's own allegations suggest that these individuals probably would not have materially assisted in his defense.

This leaves Mr. Selph's claim that trial counsel should have interviewed M.S.'s cousin Jesslyn Selph because, he implies, she would have contradicted M.S.'s testimony that M.S. disclosed Mr. Selph's sexual abuse to her. Assuming every fair-minded jurist would agree that trial counsel acted unreasonably in failing to interview Ms. Selph, Mr. Selph's ineffective assistance claim on this basis still fails because, for the two reasons discussed below, he has not shown that every fair-minded jurist would find *Strickland* prejudice.

First, as noted above, "the *Strickland* prejudice prong may not be satisfied through speculation." *Moore*, 534 F. App'x at 724. Yet Mr. Selph presents only speculation that Ms. Selph would have contradicted M.S.'s testimony that she told Ms. Selph about Mr. Selph's sexual abuse. Mr. Selph reasons that if M.S. had made the reported disclosure to Ms. Selph, the prosecution would have called Ms. Selph as a witness. (Doc. 12-4 at 277.) But this reasoning is flawed because the prosecution could have had other reasons for not calling Ms. Selph, *e.g.*, the difficulty in getting her testimony admitted without committing prejudicial error and the relatively low probative value such testimony would have had, since it likely could not have been admitted to prove the ultimate issue of whether sexual abuse occurred. *See* Fed. R. Evid. 801(c), 802 (out-of-court statement offered to prove truth of matter asserted therein is generally inadmissible hearsay).

Mr. Selph also points out that, at a safehouse interview, M.S. reported that she disclosed the abuse to Ms. Selph and Ms. Selph told M.S.'s grandmother; but, the grandmother later denied that M.S. had ever told her about the sexual abuse.[23] (Doc. 12-1 at 4.) This does suggest that M.S. was mistaken in believing that her cousin told her grandmother about the abuse. However, at trial, M.S. did not testify that her cousin told her grandmother—likely because she lacked personal knowledge on this point—and her apparently mistaken belief on this point does not contradict her reports and testimony that she disclosed the abuse to her cousin.

The second reason a fair-minded jurist could conclude Mr. Selph has failed to show *Strickland* prejudice from his counsel's alleged failure to interview Ms. Selph is that "[e]vidence not presented at trial which at most would have diminished the credibility of [a witness's] testimony, or factual discrepancies not raised which do not go directly to the ultimate issue, are highly unlikely to have resulted in a different outcome." *United States v. Saunders*, Cr. No. 04-2147, 2008 WL 11450509, at *8 (D.N.M. Oct. 3, 2008) (citing *United States v. McMahon*, 2005 WL 115506, at *9-*10 (10th Cir. Jan. 20, 2005)), *report and recommendation adopted*, Cr. No. 04-2147, 2008 WL 11450726 (D.N.M. Oct. 31, 2008). And here, evidence contradicting M.S.'s testimony that she disclosed sexual abuse to her cousin would not have gone directly to the ultimate issue of whether the abuse occurred; rather, at most, it would have diminished M.S.'s credibility. Thus, and particularly in light of the physical and forensic evidence corroborating M.S.'s account of the charged abuse, even if defense counsel had interviewed Ms. Selph and learned that M.S. did not disclose the abuse to her, and even if Ms. Selph had so testified at trial, this testimony would have been unlikely to have resulted in a different outcome.

---

[23] However, the grandmother did state that "it would not surprise her if [Mr. Selph] was sexually abusing" M.S. because Mr. Selph "was a very mean person" and the grandmother "was scared of him." (Doc. 12-1 at 4.)

For all of the above reasons, the state courts acted reasonably and in accordance with clearly established federal law in rejecting Mr. Selph's ineffective assistance claim based on his trial counsel's failure to interview the friends and relatives listed in his state habeas petition.

3.    Failure to Move for Mistrial Following Dr. Trujillo's Testimony

Mr. Selph next claims that his trial counsel provided him with constitutionally ineffective assistance by failing to move for a mistrial following Dr. Trujillo's testimony. (Doc. 6 at 10; *see* Doc. 12-4 at 286-87; Doc. 12-5 at 41-49.) However, a fair-minded jurist could find that this claim fails to satisfy either *Strickland* prong. With respect to the first prong, as discussed in Section IV.A., above: (1) Dr. Trujillo never opined that Mr. Selph committed sexual abuse; (2) the trial court instructed the jury to disregard Dr. Trujillo's testimony that she was treating M.S. for psychological disorders "related to sexual abuse," (Tr. 1 at 102); and, (3) viewed in context, Dr. Trujillo permissibly testified that the behaviors for which she was treating M.S. were "consistent with a person who suffered sexual abuse." *Parker*, 394 F.3d at 1312. Thus, a fair-minded jurist could conclude that it was reasonable for defense counsel not to move for a mistrial, to avoid wasting time and damaging her credibility with the trial judge.

With respect to the second *Strickland* prong, in turn, a fair-minded jurist could also find no reasonable probability that the outcome of Mr. Selph's trial would have been different had his counsel moved for a mistrial. As discussed in Section IV.F., below, the trial court was well aware of the law governing the admissibility of Dr. Trujillo's testimony, outlined its permissible scope, and accepted a proffer of it before allowing it to be presented to the jury. And while Dr. Trujillo's testimony that she was "treating [M.S.] for this" could be construed to mean that she was treating M.S. for severe, intense, long-term sexual trauma, it could also be construed to mean that she was treating M.S. for symptoms and diagnoses consistent with such trauma, which is within the scope

of testimony the trial court indicated it would permit. (Tr. 1 at 110; *see id.* at 105-06.) A fair-minded jurist could therefore find there was no reasonable probability that the trial court would have granted a mistrial based on Dr. Trujillo's testimony, had his counsel moved for one. For all of these reasons, the state courts acted reasonably and in accordance with clearly established federal law in rejecting Mr. Selph's ineffective assistance claim based on his trial counsel's failure to move for a mistrial.

### 4.  Failure to Retain Expert Witness

Mr. Selph next contends that his trial counsel provided him with constitutionally ineffective assistance by failing to retain an expert witness to counter Dr. Trujillo's testimony.[24] (Doc. 6 at 10; *see* Doc. 12-4 at 279-80.) Mr. Selph raised this issue on state habeas review, arguing that, had trial counsel retained such an expert, "the defense would have provided the jury with an antipodal hypothesis that would have undermined Dr. Trujillo's assertions" that she was treating M.S. for PTSD consistent with severe, intense, long-term sexual abuse. (Doc. 12-4 at 280.)

With respect to the first *Strickland* prong, "strategic decisions—including whether to hire an expert—are entitled to a strong presumption of reasonableness. Defense lawyers have limited time and resources, and so must choose from among countless strategic options." *Dunn v. Reeves*, 594 U.S. 731, 739 (2021) (quotation marks and citations omitted). Here, instead of retaining an expert, defense counsel chose to attack Dr. Trujillo's testimony by getting her to admit that M.S.'s behaviors and diagnoses were consistent not only with sexual abuse, but also with other sources

---

[24] In his state habeas petition, Mr. Selph asserted that his trial counsel was ineffective because the prosecution called "multiple expert witnesses" while "the defense called none." (Doc. 12-4 at 279.) However, I confine my analysis to Mr. Selph's claim challenging counsel's failure to retain an expert to counter Dr. Trujillo's testimony because Mr. Selph did not specifically identify any other type of expert witness his counsel should have retained, nor did he explain how any other experts could have helped his defense. (*See id.* at 279-80.)

of trauma to which M.S. was or may have been exposed, including the child's family splitting up, living in poverty, witnessing the abuse of a loved one, and residing with a parent who has mental health issues. (Tr. 1 at 112-13.) A fair-minded jurist could certainly conclude that this was a reasonable choice on counsel's part, particularly because Mr. Selph has failed to explain how an opposing expert could have credibly rebutted Dr. Trujillo's testimony any better than her own admissions did. *See Harrington,* 562 U.S. at 111 ("*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense. In many instances cross-examination will be sufficient to expose defects in an expert's presentation.").

With respect to the second *Strickland* prong, a fair-minded jurist could also find there was no reasonable probability that the outcome of Mr. Selph's trial would have been different if his trial counsel had retained an expert to counter Dr. Trujillo. In this regard, Mr. Selph speculates that a defense expert could have offered "an antipodal hypothesis that would have undermined Dr. Trujillo's assertions." (Doc. 12-4 at 280.) However, he does not identify any aspects of Dr. Trujillo's testimony that were vulnerable to plausible rebuttal, beyond the rebuttal his defense counsel secured on cross-examination. Mr. Selph's speculation thus fails to satisfy the *Strickland* prejudice prong. *Moore,* 534 F. App'x at 724. For all of these reasons, the state courts acted reasonably and in accordance with clearly established federal law in rejecting Mr. Selph's ineffective assistance claim based on his counsel's failure to retain an expert witness.

5.  Failure to Impeach M.S. with Prior Inconsistent Statements

Mr. Selph next claims that his trial counsel provided him with constitutionally ineffective assistance by failing to impeach M.S. with prior inconsistent statements. (Doc. 6 at 10; Doc. 12-4 at 280-85.) Mr. Selph raised this claim on state habeas review, arguing that his counsel could have

impeached M.S. in two ways. First, Mr. Selph claims that his counsel should have impeached M.S. by showing that, at her safehouse interview, she initially said that Mr. Selph put his penis "in [her] butt," but later said that he put his penis "on" or "outside [her] butt" rather than "in" it. (Doc. 12-4 at 281-83.) Second, Mr. Selph claims that his counsel should have pointed out that the prosecution decided not to charge him with vaginally penetrating M.S. even though she stated that he did so at her safehouse interview and at trial. (*Id.* at 283.)

With respect to the first *Strickland* prong, it is true that "counsel's failure to impeach a key prosecution witness is *potentially* the kind of representation that falls outside the wide range of professionally competent assistance." *Moore v. Marr*, 254 F.3d 1235, 1241 (10th Cir. 2001) (emphasis added) (quotation marks omitted). Nevertheless, as explained below, a fair-minded jurist could conclude that defense counsel's decision not to impeach M.S. in the ways Mr. Selph suggests was objectively reasonable.

As alleged by Mr. Selph, M.S.'s second set of safehouse statements about sex acts involving her "butt" do appear to be inconsistent with her first, and also with her trial testimony that Mr. Selph ejaculated "in" her "butt" a few times. (*See* Tr. 1 at 147-48.) However, this inconsistency could reasonably be viewed as the result, not of dishonesty, but of a lack of clarity about which specific part or parts of M.S.'s "butt" Mr. Selph allegedly put his penis "in" or "on," *e.g.*, the cheeks, the intergluteal cleft, the anal verge, or the anal canal. Viewed in this way, the inconsistencies would not have significant impeachment value.

Moreover, Dr. Trujillo accounted for inconsistencies in M.S.'s safehouse interview when she testified that a child's early disclosures of sexual abuse are "not uncommon[ly]" equivocal and incomplete. Specifically, Dr. Trujillo explained that

> [i]t's not uncommon to see someone—to see a child say something was happening to me and you can't get past that for a week or two. And then—and then they start to say, well, it was under my clothes, but it was only fondling. So you kind of work with that for several months. And finally they break down and say that it involved penetration or other similar adult-type sexual acts. And then they may go back and say, well, wait a minute, I don't know if I got that right. No, it was only fondling. And then they—you know, and then they kind of push on and say, well, it only happened once. And before you know it, they're talking about all of the times that it's happened. So they—they do driblets frequently, driblets of information.

(Tr. 1 at 101-02.) This testimony further reduced the impeachment value M.S.'s inconsistent statements about sex acts involving her "butt" would have had. Then, there would have been obvious, serious drawbacks to drawing attention to M.S.'s statements and testimony that Mr. Selph put his penis in or on her buttocks, and defense counsel could have reasonably decided that these drawbacks outweighed the impeachment value of M.S.'s inconsistent statements on the subject. *See Cullen*, 563 U.S. at 196 (holding that courts must "affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as they did") (quotation marks omitted).

Next, although Mr. Selph claims his counsel should have argued that the prosecutor did not charge him with vaginally penetrating M.S. because she did not believe M.S.'s reports that he did so, there are of course many other reasons why the prosecutor might have made this decision. For example, she may have decided not to charge Mr. Selph with vaginally penetrating M.S. because she was unable to determine when this sex act happened with sufficient precision to charge Mr. Selph without violating his due process and double jeopardy rights.[25] The prosecution's charging decision therefore has little if any impeachment value. And, as with sex acts involving M.S.'s buttocks, defense counsel could have reasonably decided that the serious risk of prejudice

---

[25] M.S. stated and testified that Mr. Selph penetrated her vaginally once and ejaculated in her "butt" about five times. (Doc. 12-1 at 3-4; Tr. 1 at 147-48.) The infrequency of these alleged acts is in clear distinction to the regularity with which M.S. claimed Mr. Selph caused her to engage in fellatio; and, the regularity of the fellatio is in large part what allowed the prosecution to charge when it occurred with reasonable precision.

in calling attention to M.S.'s reports of vaginal penetration outweighed any impeachment value the prosecution's charging decision may have had.

For the reasons just discussed, a fair-minded jurist could also find Mr. Selph has failed to show *Strickland* prejudice from his counsel's failure to impeach M.S. as he suggests. Specifically, a fair-minded jurist could find there was no reasonable probability of a different verdict if defense counsel had tried to impeach M.S. with inconsistent statements about sex acts involving her buttocks and/or the prosecution's decision not to charge Mr. Selph with vaginal penetration, because the serious risk of prejudice to Mr. Selph outweighed the relatively slight impeachment value of this evidence and argument. Accordingly, the state courts acted reasonably and in accordance with clearly established federal law in rejecting Mr. Selph's ineffective assistance claim based on trial counsel's failure to impeach M.S.

6.  Failure to Offer Evidence that CYFD Never Suspected Sexual Abuse

Finally, Mr. Selph claims that his trial counsel provided him with constitutionally ineffective assistance by failing to introduce evidence that CYFD never suspected him of sexually abusing M.S. (Doc. 6 at 10; Doc. 12-4 at 285-86.) In state habeas proceedings, Mr. Selph supported this argument by alleging that counsel possessed CYFD investigative reports from "multiple" home visits showing that CYFD investigators never suspected or reported sexual abuse. (Doc. 12-4 at 285-86.) According to Mr. Selph, if his counsel had presented this evidence, it would have undermined the prosecution's case because "CYFD investigators are highly trained and skilled advocates whose job is to protect children." (*Id.*)

With respect to the first *Strickland* prong, the reports to which Mr. Selph refers are not in the record, and Mr. Selph does not describe their contents except to say that they do not include reports or suspicion of sexual abuse. (Doc. 12-4 at 285-86.) As such, Mr. Selph has presented only

speculation to support his claim that the reports would have been helpful to him. Indeed, on the present record, it is at least equally likely the reports would have been harmful because they would have revealed the nature of the complaints that caused CYFD to visit the home, making these complaints more memorable to the jury.

In addition, M.S. testified that CYFD personnel did not talk to her when they came to the home, and Mr. Selph does not dispute this testimony. (Tr. 1 at 58; *see* Doc. 12-4 at 285-86.) Thus, the reports would not have indicated that (a) M.S. denied being sexually abused, or (b) CYFD rejected any allegations of abuse she made. For these reasons, a fair-minded jurist could conclude that trial counsel's failure to introduce CYFD testimony or reports did not fall below an objective standard of reasonableness.

With respect to the second *Strickland* prong, a fair-minded jurist could also conclude there is no reasonable probability that presenting the at-issue CYFD reports would have led to a different outcome at trial. Again, Mr. Selph offers nothing more than speculation that, on balance, the reports would have helped his defense, and such speculation is inadequate to show *Strickland* prejudice. *Moore*, 534 F. App'x at 724. Thus, the state courts reasonably rejected Mr. Selph's ineffective assistance claim based on his counsel's failure to introduce evidence that CYFD never suspected or reported sexual abuse.

In sum, the state courts acted reasonably and in accordance with clearly established law in rejecting each of Mr. Selph's ineffective assistance claims and Claim Four in Mr. Selph's Amended Petition should be DENIED.

### E.  Claim Six (Challenging Trial Court's Refusal to Bar Retrial after Mistrial)

In Claim Six, Mr. Selph contends that the trial court violated his right against double jeopardy by denying his motion to bar retrial after he successfully moved for a mistrial. (Doc. 6 at

17; *see* Doc. 12-4 at 271-75; Doc. 15 at 1.) Mr. Selph raised this claim on state habeas review, arguing that the trial court abused its discretion by failing to bar retrial because the prosecutor's conduct during his first trial showed an intent to cause, or willful disregard for the risk of causing, a mistrial. (Doc. 12-4 at 274-75; *see* Doc. 12-2 at 39-43.) The state district court rejected this argument, finding that Mr. Selph failed to identify any factual support for it.[26] (Doc. 12-5 at 52.)

"A defendant's motion for a mistrial constitutes a deliberate election on his part to forgo his valued right to have his guilt or innocence determined before the first trier of fact." *Oregon v. Kennedy*, 456 U.S. 667, 676 (1982) (quotation marks omitted). Thus, "[o]nly where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." *Id.* Whether a prosecutor intended to goad the defense into moving for a mistrial is a question of fact. *Id.* at 675. As such, a state court's determination of this question is "presumed correct absent clear and convincing evidence to the contrary," and a state-court decision based on the determination "will not be overturned on factual grounds unless [it is] objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(d)(2), (e)(1)).

At his first trial on July 25, 2017, Mr. Selph successfully moved for a mistrial after the prosecutor's first witness, Ms. Sherman, testified as follows:

[PROSECUTOR:] Has custody changed since 2015?

[MS. SHERMAN:] No.

---

[26] The state district court also stated that it denied this claim because it was "a regurgitation of what was argued on appeal." (Doc. 12-5 at 52.) However, I do not rely on this reason to reject the claim because it appears to be factually incorrect: Mr. Selph did not challenge the trial court's refusal to bar retrial on direct appeal. (*See* Doc. 12-4 at 95-135.)

[PROSECUTOR:] On April 2015, did it change after that?

[MS. SHERMAN:] Well he's been incarcerated, so I had 'em …

(Doc. 13, Audio Rec. of July 25, 2017 Tr. at 11:57:53 to 11:58:10; *see id.* at 11:58:10 at 12:05:00.)

Defense counsel subsequently filed a motion to bar retrial, which the trial court denied following a hearing, stating, "[t]here is no finding by this [c]ourt that counsel for the [s]tate acted with willful disregard to provoke a mistrial" and "[r]etrial of this matter does not violate [Mr. Selph's] right against double jeopardy." (Doc. 12-2 at 39-43; Doc. 12-3 at 5-6.)

Initially, it was objectively reasonable for the trial court to find that the prosecutor did not intentionally goad defense counsel into moving for a mistrial when she elicited Ms. Sherman's testimony about Mr. Selph's incarceration. The prosecutor did not ask Ms. Sherman whether Mr. Selph was incarcerated, or even why custody changed in April 2015. Rather, Ms. Sherman went beyond the question asked of her when she volunteered that custody changed due to Mr. Selph's incarceration. In short, Ms. Sherman's non-responsive answer does not evidence an intent on the prosecutor's part to goad Mr. Selph into moving for a mistrial.

It was also objectively reasonable for the trial court to find that the prosecutor did not intentionally provoke a mistrial despite the litany of other errors Mr. Selph claimed the prosecutor committed at his first trial. (*See* Doc. 12-2 at 40-41.) In his motion to bar retrial, Mr. Selph argued that the prosecutor intended to cause a mistrial because: (1) her prior questioning of Ms. Sherman elicited testimony based on hearsay; (2) during her opening statement, she made improper remarks regarding her caseload, nervousness, and desire to "get justice" for M.S., and tried to ask the jury to imagine themselves in the position of M.S. or her family; (3) in voir dire, she questioned the panel about the public defenders' office, and told the panel she felt "disgusted" by the charges and

"if they did as well, maybe they should be on the jury"[27]; and, (4) during a hearing on motions *in limine* she indicated that at trial she would seek to present evidence regarding "marital issues between [Mr. Selph] and his ex-wife."[28] (Doc. 12-2 at 40-41.)

Certainly, the prosecutor's performance at Mr. Selph's first trial fell well short of perfect in many respects. Indeed, the prosecutor acknowledged as much to the trial court at the hearing on Mr. Selph's motion to bar retrial. (*See* Doc. 13, Audio Rec. of Aug. 17, 2017 Hrg. at 11:11:40 to 11:12:02.) However, all of the errors on which Mr. Selph relies can reasonably be viewed as clumsy efforts to prosecute Mr. Selph successfully, rather than deliberate or reckless attempts to derail that prosecution. And though the prosecutor's admitted awareness of her flawed performance could be viewed as a motive for provoking a mistrial, it was nevertheless reasonable for the trial court to accept her representation that she was trying to get her case back on track when Ms. Sherman testified non-responsively to Mr. Selph's incarceration. (*See id.*) Accordingly, the state courts acted reasonably and in accordance with clearly established federal law in rejecting Mr. Selph's claim based on the trial court's refusal to bar retrial. Claim Six of Mr. Selph's Amended Petition should be DENIED.

## F. Claim Seven (Challenging Trial Court's Alleged Coaching of Prosecutor)

In Claim Seven, Mr. Selph asserts that the trial court "erred in conducting a tutorial for the prosecution" on how to question Dr. Trujillo. (Doc. 6 at 18.) Mr. Selph raised this issue on state

---

[27] In fact, the prosecutor said that she "certainly appreciate[d]" some panelists coming forward to say they were too disgusted by the charges to hear the case but she asked these panelists to reconsider whether they could "really sit through" the trial despite being "uncomfortable." (Doc. 13, Audio Rec. of July 25, 2017 Tr. at 9:38:06 to 9:38:52.)

[28] During the hearing on Mr. Selph's motion to bar retrial, defense counsel further argued that the prosecution's amendment of the indictment after the mistrial was potentially evidence that the prosecutor intentionally caused a mistrial because it showed the prosecution was unprepared for the July 25, 2017 trial. (Doc. 13, Audio Rec. of Aug. 17, 2017 Hrg. at 11:07:28 to 11:08:14.)

habeas review, arguing that the challenged conduct showed unconstitutional judicial bias. (Doc. 12-4 at 275; Doc. 12-5 at 33-34.) The state district court rejected this claim because (1) the challenged conduct took place outside the jury's presence, (2) Mr. Selph did not show that it had any impact on the jury's verdict, (3) Mr. Selph "failed to make a prima facia showing as to this claim," and (4) the claim lacked merit. (Doc. 12-5 at 33, 52.)

The Due Process Clause entitles a criminal defendant to an impartial and disinterested tribunal. *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980); *see generally Republican Party of Minnesota v. White*, 536 U.S. 765, 776 (2002) "[A]n impartial judge is essential to due process."). Courts "employ a purely objective standard for determining judicial bias," asking "whether sufficient factual grounds exist to cause a reasonable, objective person, knowing all the relevant facts, to question the judge's impartiality." *United States v. Woodmore*, 135 F.4th 861, 873, 876 (10th Cir. 2025) (quotation marks and brackets omitted). Ordinarily, "adverse rulings" and "ordinary efforts at courtroom administration … are immune from charges of bias and partiality." *Id.* at 873-74 (brackets and quotation marks omitted). But

> when a judge's decisions, opinions, or remarks stem from an extrajudicial source … recusal may be warranted. Recusal is required when a judge's actions or comments reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. For example, courts have found an impermissible level of bias when a judge's remarks or actions reveal he has prejudged the guilt of a defendant.

*Id.* (quotation marks, citations, and brackets omitted).

As noted in Section I.A., *supra*, the trial court excused the jury during Dr. Trujillo's direct examination so that it could address defense counsel's objection to Dr. Trujillo's testimony that M.S. had been hospitalized for major depression and had been "very suicidal." (Tr. 1 at 104.) The court informed counsel that it would not allow Dr. Trujillo to bolster M.S.'s testimony by opining

that "the sexual abuse occurred," but would allow Dr. Trujillo to testify that M.S. displayed symptoms "consistent with somebody who's been the victim of child abuse." (*Id.* at 105-06.) The following exchange, still outside the jury's presence, then took place:

> [THE COURT]: So let's do it now. Let's just go through the testimony right now. Go ahead. Ask [Dr. Trujillo] and we'll see where we get.
>
> Q. (By [PROSECUTOR]): So you have testified you've seen the child for two years?
>
> A. Yes.
>
> Q. And have you observed -- what have you observed about her?
>
> [DEFENSE COUNSEL]: Judge, forgive me. I object to this practice business. I don't see –
>
> THE COURT: We're not practicing. We're offering. This is a tender. I'm going to make sure the testimony comes in and doesn't prejudice your client. That's what I'm trying to do.
>
> [DEFENSE COUNSEL]: Okay.
>
> THE COURT: I'm going to give you the same opportunity, so ... I'm just trying to alleviate a problem that we don't get into stuff and we're going to have to mistry the case. We're two steps that way. We're not going any closer, if I can avoid it.

(*Id.* at 106.) The prosecution proceeded to question Dr. Trujillo outside the presence of the jury, and the trial court and defense counsel agreed that the proffered testimony was proper. (*Id.* at 107-09.) Dr. Trujillo then gave substantially similar testimony in the jury's presence. (*Id.* at 109-10.)

On this record, a fair-minded jurist could certainly conclude that Mr. Selph has failed to show unconstitutional judicial bias. The conduct Mr. Selph challenges was patently nothing more than the trial judge's ordinary effort at courtroom administration, in which the judge obtained a tender of Dr. Trujillo's testimony outside the jury's presence in order to rule on its admissibility without risking another mistrial. There is no evidence that the judge's decision to employ this

procedure stemmed from an extrajudicial source, and the decision does not show the high degree of favoritism or antagonism that would be necessary to support a finding that Mr. Selph's due process rights were violated. Thus, the state courts acted reasonably and in accordance with clearly established federal law in rejecting Mr. Selph's claim that the trial court showed impermissible bias by "conducting a tutorial" for the prosecution on how to question Dr. Trujillo. (Doc. 6 at 18.) Claim Seven in Mr. Selph's Amended Petition should be DENIED.

## G.  Claim Five (Alleging Cumulative Error)

Finally, in Claim Five, Mr. Selph argues that if this Court finds any errors, it should determine their "cumulative effect." (Doc. 6 at 16.) Mr. Selph raised this claim on state habeas review, and the state district court found that it lacked merit. (Doc. 12-4 at 288-89; Doc. 12-5 at 52.)

"In the federal habeas context, a cumulative-error analysis aggregates all constitutional errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Cole v. Trammell*, 755 F.3d 1142, 1177 (10th Cir. 2014). Cumulative error analysis applies when there are "two or more actual errors." *Smith v. Duckworth*, 824 F.3d 1233, 1255 (10th Cir. 2016). "It does not apply … to the cumulative effect of non-errors." *Id.*

Because, as explained above, Mr. Selph has failed to demonstrate that he suffered any constitutional error, there are no errors that could be aggregated for purposes of a cumulative error analysis. The state courts therefore acted reasonably and in accordance with clearly established federal law in rejecting Mr. Selph's cumulative error claim and Claim Five in Mr. Selph's Amended Petition should be DENIED.

### V. CONCLUSION

As the foregoing discussion shows, Mr. Selph is not entitled to an evidentiary hearing because his allegations are general, conclusory, or contravened by the existing factual record or, if true, would not entitle him to habeas relief; and, his claims can be resolved on the record. *Anderson*, 425 F.3d at 858-59. Further, all of the claims in Mr. Selph's Amended Petition should be denied because they are without merit, except for the portion of Claim Two alleging a violation of Mr. Selph's right against double jeopardy, which should be denied because it is barred by the doctrine of anticipatory procedural default. I therefore RECOMMEND that the Court DENY Mr. Selph's Amended Petition (Doc. 6) in its entirety and DISMISS this matter WITH PREJUDICE.

KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**